## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7144 | **DATE** | 2/11/2002 |
| **CASE TITLE** | Mary O'Grady<br>vs.<br>Catholic Health Partners Services, a/k/a Columbus Hospital and St. Joseph Hospital. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    For the reasons stated in the attached Memorandum Opinion and Order, the defendant's motion for summary judgment against the plaintiff's complaint is denied. [Doc. #16].

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in **open court**. | | number of notices | | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | date docketed | | |
| ✓ | Notified counsel by telephone. | | | | 26 |
| X | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| VG (LC) | courtroom deputy's initials | | mailing deputy initials | | |

U.S. DISTRICT COURT CLERK

02 FEB 12 PM 6: 09

FILED-ED 01

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
FEB · 2002

| | |
|---|---|
| Mary O'Grady, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No: 00 C 7144 |
| v. | ) |
| | ) *FEB 1 3 2002* |
| Catholic Health Partners Services, | ) HONORABLE DAVID H. COAR |
| a/k/a/ Columbus Hospital and St. Joseph | ) |
| Hospital, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Before this court is defendant's, Catholic Health Partners Services, a/k/a Columbus Hospital and St. Joseph Hospital ("Hospitals"), motion for summary judgement against plaintiff's, Mary O'Grady ("O'Grady") complaint alleging violations under the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the Fair Labor Standards Act, 29 U.S.C. § 201 ("FLSA"), and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* For the following reasons, the defendant's motion is denied.

### Statement of Facts

O'Grady began working as a Risk Manager at Hospitals on October 16, 1995. In 1997, the plaintiff's title changed to Risk Manager Northside. The Risk Manager consults, develops, or directs the implementation of risk management intervention to reduce potential loss, including but not limited to actions to be taken in response to patient distress, treatment procedures and

1

health emergencies. Specifically, as Risk Manager North Side, plaintiff oversaw day-to-day risk management activities of the hospital, including evaluations of incident reports, educating staff and physicians regarding risk management procedures, and assisted in claims management. As Risk Manager Northside, plaintiff carried a pager and had a 24-hour accountability to respond to calls from the hospitals. Although O'Grady was classified as a salaried employee, exempt from overtime pursuant to FLSA, her job was maintained on an hourly basis with time cards and she was paid on an hourly basis when she worked less than 8 hours per day. Both Hospitals and O'Grady qualified under the FMLA as an eligible employer and eligible employee, respectively, at that time.

O'Grady began to miss time from work starting September 29, 1999 through November 4, 1999. She did not request, however, leave under FMLA at this time because she believed the illness to be self-limiting. During these absences, O'Grady called in to her supervisor at the time, Peggy Heinrich ("Heinrich"), and left voice mail messages that she would not be coming into work.

On November 4, 1999, O'Grady left work because she was ill. On that same day, O'Grady called Heinrich from a car phone from a doctor's parking lot and told Heinrich to facilitate a leave under the FMLA. Ms. Heinrich said that she would. On November 5, 1999, Tove Powell ("Powell"), responsible for administering employee requests under FMLA, sent a form to the plaintiff to be filled out for her requested leave under the FMLA.

The plaintiff was hospitalized from November 5-7, 1999 and from November 18-22, 1999, for general surgery to extract, incise and drain two teeth. Although O'Grady initially requested that she be granted intermittent leave under the FMLA dating back to September, the

form approving her request for FMLA leave only reflects the November hospitalization dates. O'Grady received a letter from Powell, dated November 27, 1999, advising that her request for leave under the FMLA had been granted for November 5-7, 1999, and November 18-22, 1999, and that her request for intermittent FLMA leave had been granted for November 18-December 15, 1999. Subsequently, all of O'Grady's time, dating back to September 1999, was included in her leave requested pursuant to FMLA.

After speaking with an attorney and performing calculations, Sarah Piekielny ("Piekielny"), Director of Employment-Employee Relations in the Human Resources Department of Hospitals, and Heinrich determined that the Hospitals could exercise their option to designate plaintiff a "key employee" under FMLA and they would not have to restore her to her original position. At a November 30, 1999, meeting with Heinrich and Miller, O'Grady was advised that she was a "key employee" under the FMLA, a nd consequently, while she would be granted her requested leave under th FMLA, they could not guarantee that they could keep her position open because it would cause economic injury and harm to the organization. The plaintiff was advised during that meeting that Hospitals would seek a replacement for her unless she was able to return to work soon.

Believing that her job was on the line, O'Grady informed Heinrich that she would return to work part-time on Thursday of that week, to resume full-time employment the following week, and Heinrich agreed O'Grady did not return to work that Thursday, December 2, 1999, and left a voice mail message for Heinrich informing her that she ill and that she could not come in to work. Later that day, O'Grady received a call from Heinrich, Piekielny, and Miller advising her position would be in jeopardy if she did not return to work the following Monday. Following

the December 2, 1999, meeting, O'Grady understood that although her position might be filled, she was still granted full leave under the "FMLA" and then would receive leave under the Medical Leave of Absence Policy, and understood that she was still eligible for benefits.

On the following Monday, December 6, 1999, Heinrich agreed to allow the plaintiff to work part-time, instead of full-time, beginning December 6, 1999. O'Grady came to work on December 6, 1999, and at that time, she signed a letter confirming the part-time schedule understanding that she would lose her job if she did not sign. The plaintiff continued working until December 20, 1999, when she called in sick. Plaintiff returned to work following her December absence and then missed work in January, including January 3-5, 2000. O'Grady was re-hospitalized over the weekend of January 8-9, 2000, at West Suburban Hospital for coronary symptoms. Plaintiff telephoned Heinrich at home during this hospitalization and advised that she would not be able to come in on Monday, January 10, 2000.

On January 10, 2000, Piekielny wrote a letter to O'Grady advising her that if she forwarded the required physician certification to Powell by January 14,2000, her January absences would be counted toward her intermittent leave under the FMLA. O'Grady returned to work on January 11, 2000, but did not return after Thursday, January 13, 2000. Subsequently, O'Grady received a letter from Piekielny stating that she would need to fill the position and would be extending an offer to another candidate and reiterating that the plaintiff was considered to be a "key employee" under the FMLA.

O'Grady received the full 12 weeks leave allowed pursuant to the FMLA and received all the paid time off she had accrued. Her position as Risk Manager Northside was filled on February 1, 2000. O'Grady did not have any contact with her employer about her position from

4

late February 2000 to April 28, 2000. On April 28, 2000, O'Grady's extension of leave under the

Medical Leave of Absence ("MLA") expired and she spoke with Miller. As a result of believing

that she was no longer employed by Hospitals, plaintiff did not provide any medical certification

to Hospitals regarding her current health status. Plaintiff sough disability benefits. The next time

O'Grady spoke with Heinrich, Piekielny, and Miller was at her employment benefits hearing in

June 2000. O'Grady's claim for disability benefits was denied because the medical certification

reasons were unclear. She did not appeal the decision rejecting her application for disability

benefits, nor did she provide them with any further certification or documentation.

The plaintiff received a letter from Hospitals indicated that September 18, 2000 was her

cut-off date from inactive employment at the Hospitals.

### Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

R. Civ. P. 56(c); Cox v. Acme Health Serv., Inc., 55 F.3d 1304, 1308 (7th Cir. 1995). A genuine

issue of material fact exists for trial when, in viewing the record and all reasonable inferences

drawn from it in a light most favorable to the non-movant, a reasonable jury could return a

verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct.

2505, 2510 (1986); Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir. 1998).

The movant bears the burden of establishing that no genuine issue of material fact exists.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986); Hedberg v. Indiana

Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995). If the movant meets this burden, the non-movant

must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule 56(e); <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322, 106 S. Ct. at 2552-53. The non-movant cannot rest on the pleadings alone, but must designate *specific facts* in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. <u>Selan v. Kiley</u>, 969 F.2d 560, 564 (7th Cir. 1992). The non-movant "'must do more than simply show that there is some metaphysical doubt as to the material fact.'" <u>Id.</u> (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)). A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." <u>Anderson</u>, 477 U.S. at 250, 106 S. Ct. at 2511. Weighing evidence, determining credibility, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. <u>Anderson</u>, 477 U.S. at 255, 106 S. Ct. at 2515.

<h3 style="text-align:center">Analysis</h3>

## I.  The Family Medical and Leave Act

The defendants argue that the plaintiff cannot prove that the defendants discriminated against her and violated the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the Fair Labor Standards Act, 29 U.S.C. § 201 ("FLSA"), and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* This court disagrees.

The FMLA provides that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the Act. 29 U.S.C. § 2615(a)(1). Under the Act, eligible employees may take twelve work weeks of leave within a twelve month period in the event that the employee suffers from a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). At the conclusion of the qualified leave period, the employee is entitled to reinstatement to the position the employee previously held or to an equivalent one with the same terms and benefits that existed prior to the exercise of leave. 29 U.S.C. § 2614(a). In certain circumstances, however, the Department of Labor Rules and Regulations allow an employer the right to fill the position prior to when an employee returns from leave:

> c) In addition to the circumstances explained above, an employer may deny job restoration to salaried eligible employees ("key employees," as defined in paragraph (c) of § 825.217) if such denial is necessary to prevent substantial and grievous economic injury to the operations of the employer; or may delay restoration to an employee who fails to provide a fitness for duty certificate to return to work under the conditions described in § 825.310.

29 CFR s 825.216. The applicable Rules and Regulations set forth the factors for determining whether or not an employee qualifies as a "key employee":

> (a) A "key employee" is a salaried FMLA-eligible employee who is among the highest paid 10 percent of all the employees employed by the employer within 75 miles of the employee's worksite.

> (b) The term "salaried" means "paid on a salary basis," as defined in 29 CFR 541.118. This is the Department of Labor regulation defining employees who may qualify as exempt from the minimum wage and overtime requirements of the FLSA as executive, administrative, and professional employees.

> (c) A "key employee" must be "among the highest paid 10 percent" of all the employees--both salaried and non-salaried, eligible and ineligible--who are employed by the employer within 75 miles of the worksite.

(1) In determining which employees are among the highest paid 10 percent, year-to-date earnings are divided by weeks worked by the employee (including weeks in which paid leave was taken). Earnings include wages, premium pay, incentive pay, and non-discretionary and discretionary bonuses. Earnings do not include incentives whose value is determined at some future date, e.g., stock options, or benefits or perquisites.

(2) The determination of whether a salaried employee is among the highest paid 10 percent shall be made at the time the employee gives notice of the need for leave. No more than 10 percent of the employer's employees within 75 miles of the worksite may be "key employees."

29 CFR s 825.217.

## A. Count I – Denial of Substantive Rights Under the FMLA

With respect to the plaintiff's contention that Hospitals denied her the substantive rights guaranteed under the FMLA, both the plaintiff and Hospitals agree that (1) the plaintiff was an "eligible employee" under the FMLA; (2) Hospitals is an "employer" subject to the FMLA; and (3) plaintiff was entitled to leave under the FMLA. The sole issue in Count I is whether Hospitals denied plaintiff a benefit to which she was entitled.

To succeed on an FMLA claim, Plaintiff must prove by a preponderance of the evidence (1) that she is an eligible employee under the FMLA; (2) that the defendant is an employer under the FMLA; (3) that she is entitled to leave under the FMLA; and (4) that defendants improperly denied her leave under the FMLA. Dormeyer v. Comerica Bank of Illinois, 1997 WL 403697 (N.D. Ill. 1998).

### 1. Failure to Provide Plaintiff with Leave Entitled Under the FMLA

The plaintiff argues that Hospitals denied her FMLA leave from September 1999 and forced her to take intermittent leave from November 18, 1999 to December 15, 1999 and thereby denied her right to take 12 weeks of continuous leave under the FMLA.. The defendant contends

that the dates on which the plaintiff took leave under the FMLA were the dates she requested and agreed to, and for which she had obtained medical authorizations. The defendant further asserts that once the plaintiff obtained further medical authorizations, the plaintiff's leave dating back to September 1999 was included in her FMLA leave.

The FMLA includes a mechanism by which an employer may ascertain whether an employee's absence qualifies as FMLA leave; specifically, "[a]n employer may require that a claim that an employee is unable to return to work because of the continuation, recurrence, or onset of [a] serious health condition ... be supported by ... a certification issued by the [employee's] health care provider." 29 U.S.C. § 2614(c)(3)(A). The federal regulation interpreting the certification provision of the Act states that if the certification is inadequate, "[t]he employer shall ... provide the employee a reasonable opportunity to cure any such deficiency." 29 C.F.R. § 825.305(d); see Strickland v. Water Works and Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1209 (11th Cir. 2001).

Therefore, according to the implementing regulations, Hospitals is entitled to require that an employees' serious health condition be verified by at least one medical certification before such employee may take leave under the FMLA. In this case, Hospitals exercised its right. Once the plaintiff provided Hospitals with a second certification from Dr. Luskin-Hawk, demonstrating that her absences prior to the November hospitalizations were related to her serious health condition, Hospitals adjusted O'Grady's FMLA approval to correctly show her continuous illness from September 1999.

9

## 2. *Failure to Restore Plaintiff an Equivalent Position*

O'Grady also argues that the defendant denied rights under FMLA by failing to restore her to an equivalent position following her illness in violation of 29 U.S.C. § 2614. The defendant contends that O'Grady was properly classified as a "key employee" under the FMLA, and therefore she was not entitled to restoration of her job.[1] O'Grady claims that there is a genuine issue of material fact as to (1) whether plaintiff was actually a "key employee" (2) whether restoring plaintiff to her position would have caused Hospitals significant and grievous economic injury, and (3) whether defendant provided adequate notice to plaintiff that it was classifying her as a key employee.

As stated above, a "key employee" is a salaried eligible employee who is among the highest paid 10 percent of all employees - both salaried and non-salaried, eligible and ineligible - employed by the employer within 75 miles of the employee's worksite. 29 U.S.C. § 2614(b)(2). Further, an employer may deny job restoration to salaried eligible employees key employees if such denial is necessary to prevent substantial and grievous economic injury to the operations of the employer. 29 CFR s 825.216. Both parties agree that the plaintiff was classified as a salaried employee, exempt from overtime pursuant to FLSA, and she was not paid overtime to respond to pager calls. Despite being a salaried employee, however, the plaintiff maintained hourly time cards and was paid on an hourly basis when she worked less than eight hours a day. In addition, plaintiff asserts that despite the fact that plaintiff's base wages may have placed her among the

---

[1] The defendant also argues that the issue of whether the O'Grady was a "key employee" is moot since O'Grady did not return to work. In this court's view, however, there is an issue of fact as to whether O'Grady did not return to work because Hospitals did not provide O'Grady with her an equivalent position to which she may have been entitled.

highest paid ten percent, the plaintiff, in fact, did not fall into the highest ten percent when compared to the large number of employees who received thousands of dollars in overtime.

At the outset, in this court's view there is a genuine issue of fact as to whether O'Grady was properly classified as a "key employee" given the possibility that many hourly workers may have had yearly incomes far above the plaintiff's. Hospitals has not provided any evidence to resolve such an issue.

Further, with respect to the issue of a qualifying salaried employee, the Department of Labor's regulations define a salaried employee in some detail in the interpretations section to the regulations:

> An employee ... regularly receives each pay period on a weekly or less frequent basis, a predetermined amount constituting all or part of his [or her] compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.... The employee must receive his [or her] full salary without regard to the number of days or hours worked.

29 C.F.R. § 541.118(a). The salary must be a predetermined amount, and deductions may not be made "for absences occasioned by the employer or by the operating requirements of the business," such as "when work is not available." Id. § 541.118(a)(1). Deductions from salary are permissible for absences greater than a day when the employee is absent for personal reasons, id. § 541.118(a)(2), or absent for sickness or disability when the employee has no more leave time. Id. § 541.118(a)(3). Finally, the interpretations allow for "[p]enalties imposed in good faith for infractions of safety rules of major significance" without affecting an employee's salaried status. Id. § 541.118(a)(5). "Safety rules of major significance include only those relating to the prevention of serious danger to the plant, or other employees, such as rules prohibiting smoking in explosive plants, oil refineries, and coal mines." Id.; see also Klein v. Rush-Presbyterian-St.

11

Luke's Medical Center, 990 F.2d 279, 283 (7th Cir. 1993).

In this case, viewing the evidence in favor of the non-movant, there is a genuine issue of material fact as to whether O'Grady was properly classified a salaried employee under the FLSA. If in fact, Hospitals deducted her pay any day that she worked less than eight hours, then her classification as a "salaried employee" under the FLSA is suspect.

Even if the plaintiff was properly classified as a "key employee," there is a genuine issue of material fact as to whether restoring the plaintiff to her original position would have caused Hospitals "substantial and grievous injury." The regulations promulgated by the Department of Labor also address the "substantial and grievous economic injury" standard. Restoration may be denied only when restoration itself--not the employee's absence--will cause substantial and grievous economic injury. See 29 C.F.R. § 825.218(a) (1999). "If permanent replacement is unavoidable, the cost of then reinstating the employee can be considered in evaluating whether substantial and grievous economic injury will occur from restoration." Id. § 825.218(b). Although there is no precise test for substantial and grievous economic injury, see id. § 825.218(c), the standard is "different from and more stringent than the 'undue hardship' test under the ADA," id. § 825.218(d). Finally, if restoration "threatens the economic viability of the firm" or "causes substantial, long-term economic injury," then the standard would be met, but "[m]inor inconveniences and costs that the employer would experience in the normal course of doing business would certainly not" meet the standard. Id. § 825.218(c); see also Kephart v. Cherokee County, N.C., 229 F.3d 1142, 2000 WL 1086802, *1 (4th Cir.(N.C.)).

Instead of addressing the issue of whether restoring O'Grady would have caused Hospitals "substantial and grievous economic injury," Hospitals instead discusses the injury that

potentially would have been caused to Hospitals if it had not found a replacement for the plaintiff. This, however, is not the relevant inquiry. Consequently, a genuine issue of fact remains as to whether restoring the plaintiff to an equivalent position would have caused Hospitals "substantial and grievous economic injury."

Therefore, the defendant's motion for summary judgement against the Count I of the plaintiff's complaint is denied with respect to the issue of whether Hospitals improperly denied her leave under the FMLA by classifying her as a "key employee" or refusing to restore her to an equivalent position to which she was entitled.

## B.    Count II – Retaliation Claim

The defendant argues that O'Grady has failed to demonstrate any discriminatory intent on the part of the defendant to support her claim that Hospitals retaliated against her for exercising her rights in violation of the FMLA. This court disagrees.

The second category of FMLA claims are based on discrimination or retaliation for exercising right under the FMLA. In order to state a *prima facie* claim for retaliatory discharge under the FMLA, a plaintiff must show: (1) that she engaged in the statutorily protected activities; (2) she suffered an adverse employment action; and (3) there was a causal relationship between the protected activity and adverse action. Rizzo v. Sheahan, 266 F.3d 705, 714 (7th Cir.2001). Upon this showing, the burden shifts to the defendants to present a legitimate, non-discriminatory reason for employee's' termination. Rizzo, 266 F.3d at 715. If the defendant is able to provide such a reason, the burden shifts back to the employee to demonstrate that employer's stated reason for terminating her was merely a pretext for retaliation. Id.

While both parties agree that O'Grady engaged in the statutorily protected activity, issues

13

over whether O'Grady has established that she suffered an adverse employment and whether O'Grady has established a causal link between the protected activity and the adverse action remain.

Hospitals argues that O'Grady did not suffer any adverse employment actions. In support of her claim, O'Grady claims that an inference of retaliation can be drawn from the fact that Hospitals repeatedly told O'Grady that she would be replaced if she took full-time leave. And, in fact, when O'Grady chose to take full-time leave, Hospitals replaced her with someone who Hospitals intended to keep permanently. In support of its position, Hospitals contends that the plaintiff can not demonstrate any discriminatory intent because it offered O'Grady her job back and she never responded. The plaintiff contends that she never officially was re-offered her job by Hospitals, and therefore she believed that she had been terminated. Pending a determination as to whether O'Grady was an employee and therefore entitled to return to an equivalent position, the factual question of whether Hospitals actually presented O'Grady with her former is job is genuine and material. Secondly, Hospitals argues that O'Grady was never terminated but rather taken off the payroll upon the expiration of her leave under the FMLA, MLA and thirteen weeks of inactive status. O'Grady claims that she believed that she had been terminated. In this court's view, given there is a genuine issue of material fact as to whether Hospitals retaliated against O'Grady, on the basis of her choice to take full-time leave under the FMLA, Hospitals' reasons are not legitimate. Consequently, the defendant's motion for summary judgment against the plaintiff's retaliatory discharge claim is denied.

## II. Count III - Fair Labor Standards Act

The FLSA, 29 C.F.R. 541.118, defines a salary as a form of compensation that is not subject to reduction because of variations in the quality or quantity of the work performed, nor can a salary take into consideration the number hours and days worked. As discussed above, in this court's view, there is a question as to whether O'Grady even qualified as a salaried employee under the FLSA, given that her compensation was deducted if she worked less than eight hours a day. Therefore, the defendant's motion for summary judgment against the plaintiff claim under the FLSA is denied.

## III.    Count IV - Illinois Wage Payment Collection Act

This court may exercise supplemental jurisdiction over the plaintiff's claim under the Illinois Wage and Collection Payment Act. 28 U.S.C. § 1367(a).

### Conclusion

For the foregoing reasons, the defendant's motion for summary judgment is denied.

Enter:

David H. Coar

United States District Judge

Date:

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 95 C 827 | **DATE** | 2/11/2002 |
| **CASE TITLE** | James R. King vs. State Board of Elections, et. al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reaosons stated in the attached Memorandum Opinion and Order, the defendant-intervenors' petition for fees is granted. [Doc. # 144]. Defendant-Intervenors are to file an updated motion for fees pursuant to Local Rule 54.3(4) on or before April 12, 2002. The parties are directed to proceed under Local Rule 54.3 to attempt in good-faith to agree on the amount of fees and expenses.

(11) X For further detail see order attached the original minute order.

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| vg(lc) | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES R. KING | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 95 C 827 |
| STATE BOARD OF ELECTIONS, DAVID | ) | |
| E. MURRAY, LAWRENCE E. JOHNSON, | ) | HONORABLE DAVID H. COAR |
| HANNELORE HUISMAN, JUDITH | ) | |
| JONES, LANDGON D. NEAL, THERESA | ) | |
| M. PETRONE, and WANDA REDNOUR, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BOBBY RUSH, TIMUEL BLACK, AL | ) | |
| JOHNSON, ELVIRA CARRIZALES, | ) | |
| NEOMI HERNANDEZ, and | ) | |
| THE CHICAGO URBAN LEAGUE | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| and | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant-intervenors Congressman Bobby Rush, Timuel Black, Al Johnson, Elvira

Carrizales, Neomi Hernandez, and the Chicago Urban League ("intervenors") petition this Court

for fees and costs arising from their involvement in successfully defending the Illinois Fourth

Congressional District from constitutional challenge. For the reasons discussed below, the intervenor's petition for fees is granted.

## I. Background

In the aftermath of the 1990 census, the Illinois General Assembly was charged with drawing a new congressional redistricting plan to account for a reduction in the number of congressional seats apportioned to the state. The legislature failed to enact a plan. Anticipating a legislative deadlock, a number of plaintiffs-- including the Chicago Urban League which represented the interests of voters in the then-existing African-American majority district and individual Hispanic and African-American voters-- brought suit against the Illinois State Board of Elections ("State"). These plaintiffs sought to have the then-existing congressional map declared unconstitutional and proposed a new map encompassing a newly created majority-Hispanic district and preserving three majority African-American districts under § 2 of the Voting Rights Act , 42 U.S.C. § 1973.

On November 6, 1991, a different panel of this court enjoined the State from using the then-existing congressional districting plan. See Hastert v. State Board of Elections, 777 F. Supp. 634 (N.D. Ill. 1991). This court issued an order reapportioning Illinois' twenty congressional seats to create the Fourth Congressional District, the state's first majority-Hispanic district and directed the State to implement the court's redistricting plan. Two congressional elections have been held under this new congressional map, and in both elections, the Fourth District has chosen a Hispanic representative.

In the underlying suit, James King challenged the constitutionality of the Fourth District as well as the First Congressional District, a majority-African American district. The claim against the First District was abandoned in the midst of pre-trial discovery. The State and the defendant intervenors, some of whom were plaintiffs in Hastert, argued that King's action should be considered an attempt to modify or vacate the Hastert reapportionment order. Thus, they urged the court to transfer the case to the Hastert panel pursuant to Local General Rule 2.21D(8). This court denied that request while at the same time acknowledging that King's suit "either directly or indirectly challenged or implicated factual findings and legal conclusions made by the Hastert court." Mem. Op. at 4.

According to counsel for the intervenors, following the ruling, to preserve the gains made in Hastert, they offered to serve as special counsel to the Office of the Atttorney General. The State chose to proceed with staff counsel. Thus, the intervenors and the Department of Justice have born the costs and legal fees and played the major role in successfully defending the case. The State's role was passive. The State did not participate in the briefing of substantive issues, rarely cross-examined at trial, and put on no defense. Even with only nominal involvement by the State, the intervenors and the State prevailed and a judgement was entered in their favor.

## II. Discussion

The defendant-intervenors petition this court for a fee award against the State. The court agrees that the intervenors are entitled to recover fees and that the State is liable for the fee award.

The intervenors claim fees under 42 U.S.C. §§ 1973*l*(e) and 1988, pursuant to which a court "in its discretion, may allow the prevailing party a reasonable attorney's fee" in voting rights and § 1983 actions, respectively. 42 U.S.C. § 1973*l*(e); 42 U.S.C. § 1988. Because the two provisions contain nearly identical language and are driven by similar congressional purposes, the same standard applies to the evaluation of fee applications under both statutes. See Hastert. v. Illinois State Bd. of Election Comm'rs, 28 F.3d 1430, 1439 n.10 (7th Cir. 1993), cert. denied., 115 S. Ct. 426 (1994), (citing Hensley v. Eckerhart, 461 U.S. 424, 433 n.7, 103 S. Ct. 1933, 1939 n.7, 76 L.Ed.2d 40 (1983)).

Prevailing civil rights plaintiffs are presumptively entitled to fee awards See Hastert, 28 F.3d at 1439 (stating that prevailing parties "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust") (citing S. Rep. No. 94-925, at 40 (1975) reprinted in 1975 U.S. Code Cong. & Admin. News 774, 807 (addressing § 1973l(e); S. Rep. No. 94-1011, at 4 (1976) reprinted in 1976 U.S. Code Cong. & Admin. News 5908, 5912 (addressing § 1988)). On the other hand, prevailing defendants cannot recover fees against a losing plaintiff unless the plaintiff's suit is frivolous or vexatious. See Commonwealth v. Flaherty, 40 F.3d 57, 60 (3d Cir. 1994) (citing Christianburg Garment Co. v. EEOC, 434 U.S. 412, 98 S. Ct. 694, 54 L.Ed2d 648 (1978)).

This general prohibition against a defendant's recovery of fees conforms to the purposes of the civil rights acts. Fee awards are aimed at supporting private citizens who vindicate civil rights by acting as "private attorney generals." S. Rep. 1011 94th Cong., 2d Sess. 2, reprinted in 1976 U.S. Code Cong'l & Admin. News 5908, 5909; see also Donnell v. United States, 682 F.2d 240, 246 (D.C. Cir. 1982). Assessing fees against civil rights plaintiffs in favor of

prevailing defendants, then, would counter the goals of the civil rights acts by discouraging

potential plaintiffs from initiating suits. Thus, the fee-shifting statutes promote private civil

rights litigation by providing an incentive for eligible parties and affixing liability on culpable

parties.

Regarding the defendant-intervenor's eligibility for fees, the court finds that they are

entitled to a fee award. Where the equities of a case are compelling, the courts have created an

exception to the general rule that precludes prevailing defendants from recovering fees.

Although the courts have been hesitant to confront the issue head-on, they have suggested that, in

certain circumstances, the procedural posture of the parties may be disregarded. Accordingly, the

courts have indicated that parties may be realigned so as to allow defendants and defendant-

intervenors to secure fee awards, even where the plaintiff's suit is not frivolous. See, e.g., Wilder

v. Bernstein, 965 F.2d 1196, 1202 (2d Cir. 1992), cert. denied, 506 U.S. 954 (1992) (awarding

fees under § 1988 to intervenors– some of whom had originally intervened as defendants);

Commissioner Court of Median County, Tex. v. U.S., 719 F.2d 1179 (D.C. Cir. 1983)

("[N]either appellants' status as intervenors nor as defendants precludes an award of fees under

the Voting Rights Act."); Donnell, 682 F.2d at 245-46 (permitting defendant-intervenors to

obtain fee award in declaratory judgment actions). Legislative history also supports this

approach. In fact, Congress expressly contemplated that defendants and defendant-intervenors

would be eligible for fee awards:

> In the large majority of cases the party or parties seeking to enforce [civil] rights will be
> the plaintiffs and/or plaintiff-intervenors. However, in the procedural posture of some
> cases, the parties seeking to enforce such rights may be the defendants and/or defendant-
> intervenors.

S. Rep. 94-1011, at 4, n.4 (1976), reprinted in 1976 U.S. Code Cong'l & Admin. News 5908,

5912 (quoted in Wilder, 965 F.2d at 1202).

Indeed, awarding fees to the intervenors for their involvement in this case furthers the

purposes underlying §§ 1973*l* and 1988. The defendant-intervenors fought to retain a majority-

Latino congressional district and three African-American districts. They asserted a right to these

majority-minority districts pursuant to the mandates of the constitution, voting rights statutes,

and an order of this court. The congressional reports specifically cite to Shelley v. Kraemer, 344

U.S. 1, 68 S. Ct. 836, 92 L.Ed. 1161 (1948), in which plaintiffs sought to enforce a racially

restrictive covenant on a sale of property against a minority defendant, and declaratory judgment

actions brought under § 5 of the Voting Rights Act as instances in which defendants are entitled

to fee awards. See S. Rep. 94-1011 at 4, n.4, reprinted in 1976 U.S. Code Cong'l & Admin.

News 5909, 5912; S. Rep. 94-295 at 40, n.41 reprinted in 1975 U.S. Code Cong'l & Admin.

News 774, 807; Donnell, 682 F.2d at 246. Reverse discrimination actions present an analogous

situation in that, as in the type of actions cited by Congress, defendants are effectively cast in the

position of traditional civil rights plaintiffs in their efforts to vindicate rights.

In addition, the unique procedural history of this case warrants an award of fees.

Although FedKings' challenge was considered a separate case, the instant suit was, in essence, an

attack on Hastert. As such, the intervenors' efforts in this case can also be construed as post-

judgment work to ensure continued enforcement of the rights secured in Hastert. Post-judgment

efforts are reimbursable. See, e.g., Bond v. Stanton, 630 F.2d 1231, 1233 (7th Cir. 1980); Plyler

v. Evatt, 902 F.2d 273, 280-81 (4th Cir. 1990).

Further more, there is no question that the defendant-intervenors' efforts merit a fee award. To qualify as a prevailing party, a party, whether a plaintiff or defendant, named party or intervenor, must demonstrate that it contributed to the successes obtained in the case and, in the case of intervenors, that its contributions were nonduplicative of the efforts of the named party. Wilder, 965 F.2d at 1205; Donnell, 682 F.2d at 246-48. These threshold inquiries allay any concerns that parties will intervene needlessly in an attempt to recoup fees. The State does not dispute that the intervenors carried the weight of the defense while the State passively awaited the outcome. See 682 F.2d at 249 ("[I]ntervenor should be awarded attorneys' fees only if it contributed substantially to the litigation. This inquiry primarily entails determining whether the governmental ligitant adequately represented the intervenors' interest by diligently defending the suit.") Indeed, the intervenors can rightly claim the victory had in King as hard-won fruit of their labor.

Regarding liability for the fee award, equitable considerations certainly call for the State to bear the responsibility. The State argues that it is without fault and that it should not be liable for fees where it has not resisted a court order or otherwise failed to comply with the court. The State is not so blameless, however. As the Seventh Circuit noted in the Hastert case, "[t]he State Board of Elections is truly a nominal defendant, completely disinterested in the outcome of th[e] fight [over the configuration of the new congressional districts]" Hastert, 28 F.3d at 1439. The State's indifference did not change at the conclusion of Hastert. Rather, even after the appellate court's determination that the constitution demanded the inclusion of several majority-minority districts, the State refused to defend vigorously this constitutionally required map against King's challenge. Again, the State became a passive defendant, failing to take substantive positions

addressing the merits of the case.  It was in this setting that the intervenors contacted the State

and offered to serve as special counsel.  The State declined the intervenors' overture, forcing the

intervenors to assume the State's burden of defending the statutorily and constitutionally

mandated map and preserve the gains achieved in <u>Hastert</u>.

The intervenors offer a thoughtful discussion of the policy implications at play in this

case:

> In the redistricting context– where the state of the law remains in considerable
> flux and political jousting is a constant– almost any judgment is subject to some form of
> colorable challenge from a third party, whether that challenge is brought by way of
> intervention or collateral attack.  If a governmental body that violates federal voting rights
> subsequently refuses to defend a court-ordered map against such a challenge, it should at
> the very least be responsible for bearing the full costs, including attorneys' fees, of such a
> defense by private intervenors.
> The alternative is a situation whereby recalcitrant governments can sit on the
> sidelines and all but invite collateral attacks on court-imposed remedies, while private
> plaintiffs with few resources at their disposal are forced to engage in prolonged bouts of
> post-judgment litigation without even the possibility of recouping expenses.  Given the
> extraordinary complexity and expense of even the simplest voting rights case, such a
> regime would undoubtedly discourage private citizens from undertaking voting rights
> litigation in the first place.  Worse yet, such a regime would encourage the sort of
> irresponsible legislative inaction that has characterized Illinois' congressional
> redistricting process over the past two decades.  Such a result is precisely the opposite of
> what Congress intended in passing §§ 1973*l* and 1988.

Pet. at 9.

In view of the unique posture of this case, the court finds that the defendant-intervenors

are entitled to recover fees.  Usually, awarding fees to a prevailing defendant-intervenor would

discourage plaintiffs from filing civil rights suits for fear of fee liability.  Here, the plaintiff does

not incur any liability because fees are shifted to the defendant, thereby avoiding any chilling

effect on potential civil rights plaintiffs.  In the context of this case, then, a fee award serves the

dual purpose of shielding from liability civil rights plaintiffs who have brought nonfrivolous claims while at the same time encouraging civil rights intervenors to protect the public interest.

In Flaherty, the Third Circuit suggested that prevailing defendant-intervenors could obtain fees from a co-defendant. 40 F.3d at 59. In a suit brought under 42 U.S.C. §§ 1981 and 1983, the Commonwealth of Pennsylvania alleged that the city of Pittsburgh discriminated in the hiring of minority applicants within the police department. Id. The district court entered a preliminary injunction requiring the city to enact what amounted to a quota system. Id. Years after the issuance of this order, the Fraternal Order of Police and individual white male applicants challenged the injunction. 40 F.3d at 59-60. The court consolidated the cases and deemed these new parties intervening defendants to the original suit between the Commonwealth and the city. 40 F.3d at 60.

The district court granted the intervening defendants' motion to dissolve the injunction.[1] Id. When the intervening defendants petitioned for fees incurred in obtaining the dissolution of the injunction, the district court assessed 75% of the fees against the plaintiff Commonwealth and 25% against the defendant city. Id. The appellate court reversed the district court's fee award against the Commonwealth and declined to depart from the rule that a prevailing party could recover from the plaintiff only where the suit was frivolous, unreasonable, or groundless. 40 F.3d at 62.

---

[1] The Commonwealth appealed the dissolution of the injunction to the Third Circuit. 40 F.3d at 60. When the district court granted partial summary judgement in favor of the intervening defendants on their claim of discrimination in the hiring of police officers, the appeals court dismissed the Commonwealth's appeal regarding the injunction as moot. Id. The summary judgment order was later affirmed on appeal.

In a discussion following that holding, the appellate court observed that the city was the culpable party – the city had failed to challenge a constitutionally infirm injunction and, in its passivity, had allowed the injunction to remain in effect for over fifteen years. Id. The court announced that, had the district court assessed the entirety of the fee award against the city, such an award would have been upheld. 40 F.3d at 60. Granted, the propriety of the fees assessed against the city were not before the court and the discussion was indeed dicta. Nevertheless, the Third Circuit's position is instructive and compelling.

The defendant city in Flaherty was not technically a prevailing party. Instead, because the defendant-intervenors moved to dissolve the injunction, the city, though it did not obtain a favorable judgment in its name, became the passive beneficiary. In that respect, the city occupied the same role as the State in this case. The State, completely disinterested in the outcome, played a nominal part throughout the lengthy litigation underlying this case. The State can boast of a judgment in its favor, to be sure, but it is only able to do so as a result of its freeriding on the efforts of the defendant-intervenors. Notwithstanding the favorable judgment, there is not much difference between the State and the defendant in Flaherty, whom the appellate court opined should be charged with the fees incurred by the defendant-intervenors. As noted in Flaherty, assessing fees against the State serves the "dual purposes of encouraging civil rights litigation by intervenors yet not chilling a plaintiff from filing suit." 40 F.3d at 62. And just as importantly, the censurable party bears the cost.

In concluding that the prevailing defendant-intervenors are entitled to fees from the prevailing defendant, it is incumbent upon this court to address League of United Latin American Citizens Council, No. 4434 v. Clements, 923 F.2d 365 (5th Cir. 1991) ("LULAC"). In a suit

-10-

against the state of Texas, LULAC claimed that the election of district judges diluted the votes of certain minorities. 923 F.2d at 367. Asserting her interests as a Texas voter and as a sitting Texas district judge, Judge Sharolyn Wood moved to intervene on the side of the defendant state. Id. The district court permitted her to intervene in her personal capacity. Id. On appeal, the case was resolved in favor of the defendant state and the defendant-intervenors . Id. Judge Wood requested fees against Texas pursuant to §§ 1988 and 1973*l*. Id.

The Fifth Circuit reiterated that prevailing defendants were barred from recovering fees unless the plaintiff brought a frivolous suit. 923 F.2d at 368. The court entertained the argument that it look beyond the procedural posture of the case and deem Judge Wood a plaintiff so that she could recover fees. However, the court concluded that Judge Wood could not qualify as a plaintiff because she had "participated in all ways as one defending against a civil rights claim and not as one seeking to establish and rectify a violation of civil rights." Id. In contrast, in the instant case, the court is presented with an intervening party who actually took on the role of the traditional civil rights plaintiff. As explained above, these intervenors brought charges of civil rights violations, convinced the court to rectify this violation in Hastert, and, in the present case preserved the rights they had asserted. The intervenors embraced the role of a private attorney general as envisioned in the civil rights acts.

The Fifth Circuit rejected the suggestion that the prevailing named defendant bear the expenses of the prevailing intervenors' fees. See 923 F.2d at 368-69. Judge Wood insisted that "the Texas attorney general could not have won the case without her and that he did not adequately defend her interests or even properly perform his official duties." 923 F.2d at 368. In response, the court dismissed her claim as one governed by state law rather than

-11-

by the civil rights fee-shifting statutes.  Id.

This court respectfully disagrees.  First of all, the State's explicitly neutral stance regarding the disposition of this case makes it difficult for the court to deem them the "prevailing party."  Notwithstanding the determination of the formal judgment, the posture adopted by the State does not satisfy the standard for a prevailing party— that is, one who "succeeds on any significant issue in litigation which achieves some of the benefits the parties sought."  Hastert, 28 F.3d at 1439-40.  Furthermore, had the State lost the present case, the intervenors would have had to bring yet another suit to reinstate the majority- Hispanic and majority-African-American districts.  In that hypothetical case, the instant intervenors would have been plaintiffs and, had they prevailed, they would have been plainly entitled to fees from the defendant State under the fee provisions of the civil rights statutes.  The court sees no reason why they cannot recover fees at this juncture, before the court and the parties are subjected to another round of litigation. Allowing the intervenors to recover fees in the present context precludes this inefficient route.

In awarding fees to defendant-intervenors against the prevailing defendant, this court is aware that it is treading on uncharted grounds with no controlling precedent to serve as guideposts.  Considering the equities involved in this case– namely, the sui generis nature of redistricting cases, see Hastert, 28 F.3d at 1444, coupled with the unusual procedural history of this case – the court believes that it has taken the right course.

The plaintiff's voluntary dismissal of his challenge to the First Congressional District, which the African-American intervenors defended, does not preclude intervenors Rush, Black and Johnson (collectively, "African-American intervenors") from recovering fees.  The amount of the recovery remains an issue.  As long as a party obtains "the substance of what it sought [to

-12-

achieve]," the party is entitled to fees, regardless of whether the party participation lasted through the trial.  See Hastert, 28 F.3d at 1441 and n.12 (allowing plaintiff-intervenor to recover fees even where their claims were limited and they did not proceed to trial).  The African-American intervenors advocated the preservation of the three majority-African American districts, and that was accomplished.  28 F.3d at 1443 (noting that in redistricting cases, "the touchstone for whether a party 'prevails' is simply whether the party's map . . . is ultimately adopted").  As such, the African-American intervenors qualify as prevailing parties and are entitled to fees.

### III.  Conclusion

For the foregoing reasons, the defendant-intervenors' petition for fees is granted.


**Enter:**


**David H. Coar**
**United States District Judge**

**Dated:** 2/11/02